**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: _____ |
| | ) | JURY TRIAL DEMANDED |
| GROVEPORT MADISON LOCAL | ) | |
| SCHOOL DISTRICT BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**COMPLAINT**

Plaintiff United States of America, alleges:

1.      This action is brought on behalf of the United States to enforce the provisions of
Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title
VII").

2.      All conditions precedent to filing of suit have been satisfied.

**JURISDICTION AND VENUE**

3.      This court has jurisdiction over this action under 42 U.S.C. §§ 2000e-5(f), 2000e-
6(b) and 28 U.S.C. §§ 1331, 1343(a), and 1345.

4.      Venue is proper in this judicial district pursuant to 42 U.S.C. § 2000e-5(f)(3)
because all or a substantial part of the events or omissions giving rise to this cause of
action took place in this judicial district.

1

## PARTIES

5.      Plaintiff is the United States of America, which is expressly authorized to bring this action under Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

6.      Defendant Groveport Madison Local School District Board of Education (the "Board") is a governmental body created pursuant to the laws of the State of Ohio and is located within this judicial district.

7.      The Board is the body operating the Groveport Madison Local School District (the "District").

8.      The Board maintains as part of the District, the Groveport Madison High School (the "High School"), which employs administrators, teachers, and paraprofessionals to provide public education to youth residing in Groveport, Ohio.

9.      The Board is a "person" within the meaning of 42 U.S.C. § 2000e(a) and an "employer" within the meaning of 42 U.S.C. § 2000e(b).

## EEOC CHARGE AND AMENDMENTS TO THE CHARGE

10.      On February 6, 2019, Amon-Ra Dobbins filed a timely charge of discrimination based on race (Charge No. 532-2019-00155) with the United States Equal Employment Opportunity Commission ("EEOC").

11.      In his charge of discrimination, Dobbins, who identifies as African American, alleged, among other things, that while he worked as an assistant principal at the High School, he was subjected to discrimination on the basis of race when he received

2

disciplinary actions, was placed on a performance improvement plan, and had his contract not renewed.

12.     Pursuant to Section 706 of Title VII, as amended, 42 U.S.C. § 2000e-5, the EEOC investigated the charge against the Board. During the course of that investigation, the EEOC discovered evidence that Defendants retaliated against Dobbins in violation of Title VII for protesting what he perceived as Defendants' racially discriminatory treatment.

13.     The EEOC found reasonable cause to believe that, among other things, Dobbins was subjected to race discrimination and was retaliated against for protected activity, attempted unsuccessfully to achieve through conciliation a voluntary resolution of the charge based on the race and retaliation reasonable cause findings, and subsequently referred the matter to the Department of Justice.

## FACTUAL ALLEGATIONS

      A.     <u>Groveport Madison Local School District.</u>

14.     The District has eleven schools, including the High School, the only high school in the District.

15.     The District employs more than 500 employees.

16.     The vast majority of District administrators, teachers, and staff identify as white. In 2020, the District's staff was 94.7% white. At all relevant times, Dobbins was only one of two non-white administrators at the District and the only one who was African American.

17.    The Board consists of five members who are locally elected every four years. The Board is empowered by Ohio law to take tangible employment actions against District employees, like Dobbins, including, but not limited to hiring, firing, contract nonrenewals, and promotions.

18.    In the summer of 2018, Garilee Ogden started as superintendent of the District. As superintendent, Ogden was the highest-ranked employee at the District.

19.    As superintendent, Ogden had authority from the District to recommend to the Board tangible employment actions against Dobbins, including, but not limited to hiring, firing, contract nonrenewals, and promotions.

20.    As superintendent, Ogden had authority to substantially influence tangible employment actions against Dobbins, including, but not limited to hiring, firing, contract nonrenewals, and promotions.

21.    Ogden supervised District staff, including deputy superintendent James Grube, executive director of human resources Matt Cygnor, and director of secondary education, Scott Nelson. Nelson in turn directly supervised some principals in the District.

22.    The principal of the High School during all relevant allegations herein was Dr. Javir Singh. Nelson supervised Dr. Singh.

23.    As principal of the High School, Dr. Singh was Dobbins's immediate supervisor.

24.    Dr. Singh was responsible for conducting performance reviews and evaluations of Dobbins.

25.    Dr. Singh had the authority from the District to recommend or otherwise substantially influence tangible employment actions against Dobbins, including, but not limited to hiring, firing, contract nonrenewals, promotions, and performance evaluations.

26.    The rating system for performance evaluations during all relevant times was as follows: "accomplished" the highest rating; "skilled" the second highest; "developing" the next highest; and "ineffective" the lowest rating.

    B.    Dobbins's Career with the District.

27.    Dobbins began his career as a teacher with the District in approximately 2001.

28.    During his time with the District as a teacher, Dobbins was always rated "accomplished" or "skilled," the highest and second highest performance categories in the District, respectively.

29.    In or around the summer of 2017, the District, under the superintendent preceding Ogden, promoted Dobbins to assistant principal for the 2017–2018 school year where he was the sole administrator in charge of addressing discipline-related issues at the High School.

30.    Dobbins was qualified for the position of assistant principal.

31.    In his first year as an assistant principal in 2017–2018, Dobbins was rated as "skilled" by Dr. Singh.

    C.    Dobbins's Advocacy against, and Opposition to, the District's Allegedly
          Discriminatory Dress Code Policy.

32.    This action arises from the Board discriminating and retaliating against Dobbins for his advocacy against, and opposition to, the District's allegedly discriminatory Dress Code for District students ("Dress Code"). Specifically, Dobbins advocated against

having to enforce, as part of his job duties, the District's Dress Code, which he asserted was discriminatory towards African-American students.

### i. Dobbins's Job Duties.

33.     During the 2017–2018 and 2018–2019 school years, Dobbins's assistant principal duties included being the sole administrator in charge of addressing discipline-related issues at the High School.

34.     During the 2018–2019 school year, Dobbins's duties included the following:

a)  Resolving any significant violations of High School or District policy and rules involving student conduct. This required learning what happened, talking to involved students and other parties, and ensuring students' due process rights were met;

b)  Processing discipline referrals that teachers submitted to the High School's administration;

c)  Creating discipline strategy with Dr. Singh and other High School administrators and leaders and communicating that strategy to the High School's teachers, including emphasizing or deemphasizing certain High School and District rules regulating student conduct;

d)  Interpreting District policies regulating student behavior, such as the Dress Code, under the discretion the District gave Dr. Singh or other High School administrators;

    e)  Ensuring other administrators and teachers were consistently enforcing High School and District rules regulating student conduct, such as the Dress Code;

    f)  Leading the High School's discipline committee, which reviewed discipline data and suggested professional development to teachers related to discipline. Dobbins regularly facilitated the committee's meetings; and

    g)  Supervising the High School's security staff.

### ii. The District's Dress Code.

35.    The Dress Code during all times relevant to the allegations in this Complaint, states in relevant part, among other things, "No hoods, hats, coats, bandannas, and sunglasses may be worn in [the] school building or class[.]" The Dress Code was found in the 2018–2019 Student Code of Conduct.

36.    District Policy 5511 gave principals discretion in deciding what constitutes a violation of the Dress Code during the 2018–2019 school year. District Policy 5511 "designate[s] the principal as the arbiter of student dress and grooming in his/her building."

37.    At the beginning of the 2018–2019 school year, the District interpreted the Dress Code to prohibit students from wearing du-rags and bonnets.

38.    Du-rags (also known as "durags," "do-rags," "dorags," "doo-rags," and "doorags") are scarves or pieces of fabric worn on the head to protect a hairstyle, typically with the ends or corners tied together at the back. They are typically worn by African-American males to preserve their hair's pattern after brushing it. Similarly,

bonnets are typically worn by African-American females to preserve their hairstyle, especially during sleep. Du-rags and bonnets shall collectively be referenced hereafter as "du-rags.

39. At that time, the Dress Code had no language prohibiting du-rags, despite the District's interpretation that the Dress Code did restrict them.

### iii. Dobbins's Concerns About the District's Dress Code.

40. In his role as the High School administrator in charge of discipline, Dobbins grew concerned that the District's interpretation of the Dress Code was discriminatory towards African-American students. He was also concerned that the he would be required to enforce the Dress Code and to personally ensure that other teachers and administrators were enforcing the discriminatory Dress Code as well.

41. Specifically, during his time leading the High School's discipline committee, he noticed a pattern of teachers disproportionately referring African-American students for discipline because of the District's interpretation of the Dress Code to prohibit du-rags.

42. Dobbins was also concerned that the District's prohibition on du-rags resulted in teachers and administrators, including himself, disproportionately enforcing the Dress Code against African-American students wearing du-rags, resulting in a racial disparity in the Code's enforcement pattern. As a result, Dobbins believed the District's interpretation of the Dress Code was a targeted, discriminatory practice that violated the rights of African-American students and required him to enforce, as part of his job duties, discrimination towards them.

8

43.     Dobbins also noticed that some requirements of the Dress Code that applied more frequently to white students were not being enforced or only being enforced loosely.

### iv. Dobbins Successfully Advocates for a Nondiscriminatory Dress Code.

44.     Based on his concerns about the discriminatory enforcement of the Dress Code, on approximately September 21, 2018, Dobbins, in his role as the sole administrator in charge of discipline, sent other High School administrators an email asking questions about how administrators and teachers were enforcing the Dress Code and describing concerns that enforcement was inconsistent.

45.     Later that same day, at a meeting of Dr. Singh, other High School administrators, and the District's Director of Secondary Education Scott Nelson, Dobbins described the significance of du-rags for African-American students and argued that the District's interpretation of the Dress Code discriminated against them.

46.     At that meeting, Dobbins also advocated for a change to the Dress Code so that African-American students would no longer be subject to discipline for wearing du-rags and, thus, he would not be required to disproportionately discipline them based on their race.

47.     Dr. Singh said that Dobbins should raise the issue at an upcoming Building Leadership Team ("BLT") meeting with both High School administrators and teachers who were department heads.

48.     The BLT meeting took place on approximately September 25, 2018. Dr. Singh and the other High School administrators were present.

49.     During the BLT meeting, Dobbins described to the teachers the significance of du-rags for African-American students and the disproportionate disciplining of those students as a result of the District's prohibition on du-rags.

50.     After Dobbins' presentation and the discussion at the BLT meeting, all of the participants at the meeting, including Dr. Singh, agreed to permit students to wear du-rags without violating the Dress Code.

51.     The District's regulations explicitly permitted Dr. Singh to exercise his discretion in how the Dress Code should be enforced. He did not object at the BLT meeting to the proposed change to permit the High School's students to wear du-rags.

52.     The next day, on September 26, 2018, in his role as the sole administrator in charge of discipline, Dobbins emailed High School students, and then separately, all High School staff, informing them of how the Dress Code would be enforced. His email stated that du-rags were permitted as long as the face of students could be seen, and also conveyed details about other aspects of the Dress Code unrelated to du-rags.

53.     No High School staff, including Dr. Singh, responded to Dobbins's email or raised any concerns about the email.

54.     For approximately two weeks, students at the High School were permitted to wear du-rags.

### v. The District Reverses Course and Requires Dobbins to Enforce the Allegedly Discriminatory Dress Code.

55.     On approximately October 10, 2018, Ogden and a Board member visited the High School and observed African-American students wearing du-rags.

10

56.     After Ogden's visit, she instructed Dr. Singh and Nelson to prohibit du-rags at the High School.

57.     As a result, on or about October 12, 2018, Dr. Singh and Nelson instructed High School administrators to enforce a prohibition of du-rags as part of the District's Dress Code once again. As the sole administrator in charge of discipline, Dobbins was responsible for making sure other High School teachers and administrators were carrying out Dr. Singh and Nelson's instructions and for enforcing the Dress Code.

58.     At this October 12, 2018 meeting, Dr. Singh specifically directed Dobbins to return to disciplining students who wore du-rags to school. Dobbins spoke up again to raise concerns about enforcing the Dress Code against African-American students in a discriminatory manner. Dobbins warned that such selective enforcement against African-American students could be seen as the District taking away rights from African-American students. He similarly pointed out that the Dress Code would not be enforced as harshly against other groups, which could be seen as discriminatory.

59.     Dr. Singh refused to change the Dress Code, and Dobbins agreed, despite his concerns, to enforce the District's Dress Code.

> D.     Defendants Discriminate and Retaliate against Dobbins for His Advocacy against, and Opposition to, the District's Allegedly Discriminatory Dress Code.

60.     Following Dobbins's advocacy against, and opposition to, enforcement of the District's allegedly discriminatory Dress Code on or about September 21, 2018, September 25, 2018, September 26, 2018, and October 12, 2018, Defendants began to

systematically discriminate and retaliate against Dobbins for this advocacy against, and opposition to, the District's Dress Code.

61.     Dobbins's advocacy against, and opposition to, the District's Dress Code caused the District to heighten its scrutiny and supervision of him, and ultimately, to find a pretextual reason to end his employment with the District.

### i. The District Discriminates and Retaliates against Dobbins by Giving Him a Reprimand.

62.     On October 18, 2018, eight days after Ogden visited the High School, the District gave Dobbins a written reprimand that explicitly cited his email to the High School permitting du-rags as one of five examples of his failure to "uphold the [Board's] policies and procedures," such as the Dress Code. The reprimand did not mention anything related to processing student referrals. The reprimand specifically threatened Dobbins with "disciplinary action up to and including termination."

63.     In response to the reprimand, Dobbins wrote a letter to Dr. Singh, Nelson, and Matt Cygnor, head of the District's Office of Human Resources and the District's civil rights coordinator, responding to the District's assertions in the reprimand and asking for a meeting with them to come to an agreement on how Dobbins should meet performance expectations moving forward.

64.     Cygnor received Dobbins's letter on October 23, 2018.

65.     No District employees met with Dobbins in response to his letter, despite his request for a meeting.

12

ii. **The District Discriminates and Retaliates against Dobbins by Putting Him on a Performance Improvement Plan.**

66.    On November 20, 2018, the District put Dobbins on a Performance Improvement Plan ("PIP"). The District's stated reason to Dobbins for why it placed him on a PIP was because he was not processing student discipline referrals quickly enough.

67.    The PIP required Dobbins to create and implement a system for organizing the student discipline referrals he received from other teachers and administrators and processing the referrals more quickly. It also required him to create and implement a new system to regulate student behavior and attend professional development that trained Dobbins on how to effectively implement that system.

68.    All but one goal of Dobbins's PIP had a deadline of the end of the 2019 school year; the remaining goal had a deadline of March 1, 2019.

69.    The PIP was pretext for the District to fire Dobbins for his advocacy against, and opposition to, discrimination on the basis of race as a condition of his employment.

iii. **Dobbins Complains of Race Discrimination but the District Refuses to Investigate.**

70.    On November 29, 2018, Dobbins complained to the District that his placement on a PIP was racially discriminatory.

71.    On December 3, 2018, Dobbins met with Dr. Singh, Nelson, and Cygnor about his race complaint to the District.

72.    During the meeting, Dobbins again complained that the District placed him on a PIP because of his race and asked for a formal investigation into his complaint.

13

73. Cygnor did not take any action based on Dobbins's December 3, 2018 complaint and instead ignored it.

### iv. Dobbins Continues to Meet Job Performance Expectations.

74. On December 20, 2018, Dr. Singh gave Dobbins his mid-year evaluation.

75. According to the December 20, 2018 evaluation, Dobbins had made progress towards his PIP goals. In some cases, Dobbins had already met his PIP goals.

76. Dr. Singh's mid-year evaluation of Dobbins was positive. The evaluation concluded with Dr. Singh recommending that Dobbins "continue working towards" the goals of his evaluation and to "focus on the areas of improvement outlined in his improvement plan." Dr. Singh also recommended that Dobbins "create succinct and concise documentation and process" related to student referrals.

77. In response to one of the PIP's requirements, Dobbins employed a system in his office where he organized referrals into different piles based on the severity of the student behavior described in the referrals. He then processed student referrals in order of most to least severe behavior described.

78. When Dr. Singh met with Dobbins about his mid-year evaluation, Dr. Singh acknowledged Dobbins's progress towards his PIP goals and that he was otherwise meeting job performance expectations. Dr. Singh did not raise any concerns with Dobbins's performance other than Dobbins's need to process student referrals, which was one of the goals of the PIP.

14

79.     Because Dobbins's performance at this point in the school year was meeting expectations, Dr. Singh did not suggest to the District that it recommend that the Board not renew Dobbins's contract.

>     **v.     Despite Meeting Performance Expectations, the District Decides to Recommend Not Renewing Dobbins's Contract.**

80.     Yet by December 2018, based on information and belief, the District had already decided to recommend to the Board that it not renew Dobbins's contract, despite Dr. Singh's positive mid-year evaluation of Dobbins.

81.     After the District made this decision, Cygnor, in December 2018, after Dobbins's mid-year review, spoke to Dobbins and tried to convince Dobbins to resign. Cygnor gave Dobbins a letter of resignation to sign. During this conversation, Cygnor told Dobbins that the odds of Dobbins keeping his job were "stacked against" him and that remaining in his position "is not good" for Dobbins's career. He also told Dobbins "listen you're a Black guy, you will have no problem getting another job."

82.     Cygnor's resignation conversation with Dobbins was a common practice in the District when District officials decide to recommend that the Board not renew an administrator's contract. The purpose of the conversation is for the District to avoid putting an administrator on administrative leave and for the Board to avoid formally not renewing his or her contract.

83.     Dobbins refused to resign because the letter contained falsehoods about his job performance and because he believed that he still had time to meet the goals of his PIP, which had one deadline of March 1, 2019 and all remaining deadlines later in 2019.

15

### vi. The District Discriminates and Retaliates against Dobbins by Manufacturing Reasons That Led to His Nonrenewal.

84.     On or around January 26, 2019, Ogden and deputy superintendent James Grube went into Dobbins's office over a weekend while he was not there to search his office.

85.     While searching Dobbins's office, they found the student referrals being processed and went through them. Ogden and Grube's search undid weeks of organization that Dobbins completed under his system to meet his PIP goals. They took pictures of the referrals in Dobbins's office using their phones.

86.     Days later on February 4, 2019, the District gave Dobbins a poor final evaluation for the 2018–2019 school year. It was a drastically different measure of Dobbins's performance than Dr. Singh's mid-year evaluation of him, rating him as "ineffective," the lowest category, in several areas, some of which were unrelated to processing referrals. It also stated that Dobbins had "not shown any progress" toward his PIP goals even though Dr. Singh had acknowledged that he had already met some of the goals of his PIP by this day.

87.     On the same day, the District placed Dobbins on administrative leave.

88.     Ogden then recommended to the Board that it not renew Dobbins's employment contract.

89.     The District has asserted that Dobbins's failure to meet the requirements of his PIP was the basis for its nonrenewal recommendation to the Board, but this reason is pretextual to conceal intentional discrimination and retaliation.

90.     The District replaced Dobbins with a white assistant principal.

16

91.    About a month later on March 13, 2019, the Board officially terminated Dobbins when it followed the District's recommendation and voted not to renew Dobbins's employment contract.

92.    Dobbins suffered emotional distress and economic harm from the acts of discrimination and retaliation.

93.    Dobbins suffered lost wages, benefits, and other economic losses from the loss of his position.

**COUNT I**
**Title VII, 42 U.S.C. § 2000e-2(a)**
**Race Discrimination**

94.    Defendant discriminated against Dobbins in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), by subjecting him to a series of adverse employment decisions based on his advocacy against having to enforce, as part of his job duties, the District's Dress Code, which he asserted was discriminatory towards African-American students.

95.    Because Dobbins's assistant principal duties included being the sole administrator in charge of addressing discipline-related issues at the High School and therefore consistent enforcement of the Dress Code, enforcement of the Dress Code to prohibit du-rags was a term or condition of Dobbins's employment with the District.

96.    Dobbins advocated against enforcing the District's Dress Code, which he asserted was discriminatory towards African-American students.

97.    Dobbins also advocated against having to, as part of his job duties, require other teachers and administrators enforce the allegedly discriminatory Dress Code as well.

98.     Dobbins advocated against having to enforce the allegedly discriminatory Dress Code as part of his job duties on September 21, 2018, September 25, 2018, September 26, 2018, and October 12, 2018.

99.     Dobbins was qualified for his position.

100.    The District discriminated against Dobbins for his advocacy by heightening its scrutiny and supervision of him to find a reason to fire him.

101.    This heightened scrutiny and supervision of Dobbins resulted in the District giving him a reprimand, placing him on a PIP, giving him a poor final evaluation, placing him on administrative leave, and recommending contract nonrenewal to the Board.

102.    The Board discriminated against Dobbins for his advocacy by voting to not renew his contract.

103.    The District's reprimand, placement of Dobbins on a PIP, poor final evaluation, placement of Dobbins on administrative leave, and recommendation of contract nonrenewal, and the Board's decision of contract nonrenewal, all constitute adverse employment decisions.

104.    The District's reasons for its reprimand, placement of Dobbins on a PIP, poor final evaluation, placement of Dobbins on administrative leave, and recommendation of contract nonrenewal, and the Board's reasons for its decision of contract nonrenewal, are pretextual to cover up the true reasons, which are discrimination against Dobbins for his advocacy against enforcing, as part of his job duties, the allegedly discriminatory Dress Code.

**COUNT II**
**Title VII, 42 U.S.C. § 2000e-3(a)**
**Retaliation**

105.    Defendant retaliated against Dobbins for engaging in statutorily protected activity

in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

106.    Dobbins opposed, on September 21, 2018, September 25, 2018, September 26,

2018, and October 12, 2018, the District's employment practices of requiring him to

enforce, as part of his job duties, the District's Dress Code, which he asserted was

discriminatory towards African-American students. On those dates, he further opposed

the District requiring him to make other teachers and administrators enforce the allegedly

discriminatory Dress Code as well.

107.    Dobbins's opposition constitutes statutorily protected activity under Title VII.

108.    The District knew of Dobbins's protected activity of opposing the District's

employment practices of requiring him to enforce the District's allegedly discriminatory

Dress Code and ensure that other teachers and administrators were also enforcing that

policy.

109.    The District retaliated against Dobbins on October 18, 2018 when it gave him a

reprimand for these protected activities.

110.    The District retaliated against Dobbins on November 20, 2018 when it placed

Dobbins on a PIP for these protected activities.

111.    Separately, Dobbins's complaints to the District on November 29, 2018 and

December 3, 2018, that his PIP was racially discriminatory also constituted a statutorily

protected activity under Title VII.

19

112.    The District knew of Dobbins's protected activity of complaining to the District that his PIP was racially discriminatory.

113.    The District retaliated against Dobbins on February 4, 2019 when it gave him a poor final evaluation for his prior protected activities.

114.    The District retaliated against Dobbins on February 4, 2019 when it placed him on administrative leave for his protected activities.

115.    The District retaliated against Dobbins when Ogden recommended contract nonrenewal to the Board in February for his prior protected activities.

116.    The District's actions against Dobbins were materially adverse to Dobbins.

117.    There is a causal connection between Dobbins's protected activities and the materially adverse actions the District took against Dobbins.

118.    The District would not have given Dobbins a reprimand, placed him on a PIP, given him poor final evaluation, placed him on administrative leave, or recommended contract nonrenewal to the Board in the absence of his opposition to enforcement of the District's allegedly discriminatory Dress Code.

119.    The District would not have given Dobbins a poor final evaluation, placed him on administrative leave, or recommended contract nonrenewal to the Board in the absence of Dobbins complaining to the District that its placement of him on a PIP was race discrimination.

120.    The Board further retaliated against Dobbins on March 13, 2019, when it voted to not renew his contract.

121.    The Board's vote carried out the District's racially discriminatory and retaliatory actions toward Dobbins and was materially adverse to Dobbins.

122.    The Board would have renewed Dobbins's contract in the absence of Dobbins's opposition to the allegedly discriminatory Dress Code or complaint to the District that its placement of him on a PIP was race discrimination.

123.    Defendants have no legitimate nondiscriminatory reason for its adverse actions against Dobbins. Even if Defendants had such a reason, there is sufficient circumstantial evidence establishing that Defendants' stated reason is pretext for discrimination.

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court grant the following relief:

(a) Award all appropriate monetary relief, including back pay and lost benefits, to Dobbins in an amount to be determined at trial to make him whole for all losses he suffered as a result of the discriminatory and retaliatory conduct as alleged in this complaint;

(b) Award compensatory damages to Dobbins to fully compensate him for the pain, suffering, and physical ailments caused by Defendant's discriminatory conduct, pursuant to and within statutory limitations of Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a;

(c) Order Defendant to reinstate Dobbins into his prior position with full pay and benefits as if he had remained in the position throughout the intervening period;

(d) Enjoin Defendant from further discriminating and retaliating against Dobbins;

21

(e) Order Defendant to take remedial steps to ensure a non-discriminatory workplace for all District employees, including implementation of appropriate anti-discrimination and anti-retaliation policies, and providing adequate training to all employees and officials regarding the handling of discrimination and retaliation complaints; and

(f) Award such additional relief as justice may require, together with the United States' costs and disbursements in this action.

## JURY DEMAND

Plaintiff United States hereby demands a jury trial of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

Dated:  June 15, 2022

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

KAREN D. WOODARD
MD Bar (no number issued)
Chief
Employment Litigation Section
Civil Rights Division

CLARE F. GELLER
N.Y. Registration No. 4087037
Deputy Chief
Employment Litigation Section
Civil Rights Division

By:     */s/Ejaz H. Baluch, Jr.*
        EJAZ H. BALUCH, JR.
        JEFFREY G. MORRISON
        MD Bar No. 1612130032 (Baluch)
        MO Bar No. 44401 (Morrison)
        Trial Attorneys
        United States Department of Justice
        Employment Litigation Section
        Civil Rights Division
        950 Pennsylvania Avenue, NW
        Washington, DC  20530
        (202) 353-2087
        (202) 514-1005 (fax)
        Ejaz.Baluch@usdoj.gov

        KENNETH L. PARKER
        United States Attorney

        LINDA MINDRUTIU (Ohio Bar No. 82341)
        Assistant United States Attorney
        United States Attorney's Office
        Southern District of Ohio
        221 E. Fourth Street, Suite 400
        Cincinnati, OH 45202
        Telephone: (513) 684-3711
        Email: linda.mindrutiu@usdoj.gov

        *Attorneys for Plaintiff United States of America*